## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW HAMPSHIRE

Daniel Frost

     v.                                    Civil No. 05-cv-225-SM

Jo Anne B. Barnhart, Commissioner,
Social Security Administration

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), claimant, Daniel Frost, moves to reverse the Commissioner's decision denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 423, and Supplemental Security Income Benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–1383c.  In support of his motion, claimant states that the Administrative Law Judge ("ALJ") failed to ascribe appropriate weight to the opinions of his treating physician.  In addition, claimant states that the ALJ erred in assessing his credibility, failing to consider his inability to obtain medical treatment and failing to consider the restrictions caused by his depression and inability to maintain a schedule.  The Commissioner objects and moves for an order affirming her decision.

**Factual Background**

I.  Procedural History

Claimant filed an application for disability insurance benefits and supplemental security income benefits on February 27, 2003, with a protective filing date of September 26, 2002, alleging that he had been unable to work since June 1, 1997 due to his disability.  His complaints of disability included: pain in his back, knee and right hip; an enlarged bladder; body shakes; muscle spasms; depression; and anxiety.  When his application was denied at the initial level of review, he sought de novo review before an Administrative Law Judge ("ALJ").

Represented by counsel, claimant appeared and testified before an ALJ at an administrative hearing held in December 2004. On February 14, 2005, the ALJ issued an order, in which he determined, among other things, that claimant retained the residual functional capacity to perform at least some of his past relevant work.  The ALJ further determined that claimant's allegations regarding his limitations were unsupported by objective medical evidence and thus were not entirely credible. Accordingly, the ALJ concluded that claimant was not disabled, as that term is defined in the Act, at any time through the date of

his decision.

Claimant then sought review of the ALJ's decision before the Appeals Council.  However, on May 20, 2005, the Appeals Council denied his request, thereby rendering the ALJ's decision a final decision of the Commissioner subject to judicial review.  On June 22, 2005, claimant filed an action in this Court, asserting that the ALJ's decision was unsupported by substantial evidence and seeking a judicial determination that he is disabled within the meaning of the Act.  He then filed a "Motion for Order Reversing Decision of the Commissioner" (document no. 10).  The Commissioner objected and filed a "Motion for Order Affirming the Decision of the Commissioner" (document no. 11).  Those motions are pending.

II.  <u>Stipulated Facts</u>

A.  <u>Background</u>

Pursuant to this Court's Local Rule 9.1(d), the parties have submitted a statement of stipulated facts (document no. 12).  Those facts relevant to the disposition of this matter are discussed below.

At the time the ALJ issued the administrative decision, the claimant was 36 years old (Tr. 14-24, 96, 319) and had a tenth

grade education  (Tr. 34, 51-52, 137).  For part of the period under review, from September 1999 through September 2002, claimant was incarcerated and worked in the prison laundry and housekeeping departments, although this work did not constitute substantial gainful activity.  (Tr. 32, 47).  He was incarcerated intermittently from 1997 through 1999.  (Tr. 32).  His primary past work included performing maintenance for a housing complex, which he had no difficulty performing despite some pain.  (Tr. 33, 35, 50, 132).  He testified that he had recently sought work for Labor Ready and Home Depot but was unsuccessful.  (Tr. 41-43).  For purposes of his DIB application, claimant must establish that he was disabled on or before December 31, 1997, as this is the date his insured status expired.  (Tr. 29, 99).

     B.   <u>Medical Evidence</u>

         1.   <u>Physical Impairments</u>

On April 1, 1995, claimant presented to the emergency room at Wentworth Douglass Hospital with complaints of left leg pain. (Tr. 285).  Dr. Kelley A. Hails diagnosed medial collateral sprain of the left knee and provided claimant with a knee immobilizer.  Claimant was advised to remain out of work for three days as he could not work with a brace.  (Tr. 285).   He

returned to the emergency room at Wentworth Douglass Hospital on
June 20, 1995, complaining of left back and left knee pain. (Tr.
155). Claimant informed Dr. Hails that he was injured at work
when the weight of a cable fell on him, causing pain in his left
knee, which worsened with weight bearing, and back pain with
movement. He was diagnosed with lumbar strain and knee strain
for which he ws prescribed Motrin and Vicodin. Claimant
requested a stronger medication, but Dr. Hails declined, noting
that he was not in any distress and that she was concerned for
his potential for medication abuse. (Tr. 155). Claimant
returned to the emergency department three days later complaining
of continued pain in his back and left knee. (Tr. 156). Strain
of the medial collateral left knee was diagnosed and claimant was
instructed to continue  with the anti-inflammatory medication and
Vicodin and follow-up with orthopedic services if necessary.
(Tr. 156).

On June 28, 1995, claimant was examined at Seacoast Redicare
for his complaints of left knee and back pain stemming from his
work accident the prior week. (Tr. 173). He was diagnosed with
lumbar strain, resolved, and left knee strain and was provided
with a knee sleeve and restricted to "light duty." (Tr. 173).

5

At a follow-up examination on July 6, 1995, claimant stated that his symptoms were improving and his pain was decreasing.  (Tr. 175).  He had full range of motion of his back without pain and full range of motion of his knee.  He was returned to working full duty.  (Tr. 175-176).

Claimant returned to the emergency department at Wentworth Douglass Hospital on November 30, 1998 with, complaints of back pain.  (Tr. 296-297).  He was diagnosed with chronic low back pain and was instructed to rest for seventy-two hours, applying heat to the area.  He was also prescribed pain medications and referred to a pain clinic.  (Tr. 297).

On February 16, 1999, Dr. Frank A. Graf performed a consultative physical examination of the claimant.  (Tr. 196-198).  Dr. Graf diagnosed residuals of work-related injuries to the thoracolumbar spine with persistent chronic pain and radiating pain into the right buttock and hip, and medial collateral ligament sprain of the left knee.  (Tr. 197).  Dr. Graf opined that claimant's musculoskeletal pain would limit his abilities to bend, stoop, lift and carry, though he was able to sit, stand and walk.  (Tr. 197).

Claimant reported to the emergency department at Portsmouth

Regional Hospital and Pavilion on March 23, 1999, with complaints of a tooth ache and back pain.  (Tr. 183).  He stated that his back pain started the day before when he was picking up debris from a windstorm and that he had come to the emergency room from his job at Wal-Mart.  Examination revealed negative straight leg raising bilaterally with some tenderness in the right paravertebral area.  Claimant was diagnosed with back strain and an abscessed tooth for which he was prescribed Vicodin and Penicillin.  (Tr. 183).

After sustaining torsional stress to his left arm in prison, claimant was examined by Dr. Robert Harrington of Seacoast Sports Medicine on April 30, 1999, (Tr. 189).  Claimant complained of pain to the inner aspect of his left elbow, with concurrent pain in his left shoulder and upper back.  Dr. Harrington diagnosed thoracic/shoulder strain and medial collateral sprain of the left elbow and instructed claimant to ice the area and use ibuprofen and Tylenol to treat any pain.  (Tr. 189).

On May 20, 1999, Claimant returned to the emergency department at Portsmouth Regional Hospital and Pavilion complaining of left back pain and pleuritic chest pain.  (Tr. 186).  He stated that he had seen his primary care physician, who

prescribed a pain medication, but he had not taken any of the medication.  He added that his left-sided back pain was worse when he has a full stomach and with range of motion of his arm. The examining physician gave claimant two anti-anxiety pills and instructed him to take Motrin.  He also suggested that claimant massage, stretch and apply heat to his left rhomboid area and to return to his primary care physician.  (Tr. 185).  Claimant was diagnosed with left rhomboid muscle spasm, pleuritic chest pain and insomnia.  (Tr. 185).

    Claimant sought treatment at Avis Goodwin Community Health Center from September 2003 through April 2004.  (Tr. 300-301, 304-309).  On September 12, 2003, he complained to Dr. Michael Thompson of chronic back pain since 1988 and difficulty sleeping. (Tr. 300).  Dr. Thompson assessed back pain and a sleep disorder. (Tr. 301).  He recommended that claimant start regular use of ibuprofen, engage in physical therapy and increase his walking. Dr. Thompson prescribed Trazodone to treat claimant's insomnia and discussed the importance of regular exercise and a regular sleep schedule.  Dr. Thompson opined that claimant was not disabled and was able to work in some capacity at that time, though he would advise against any heavy lifting or prolonged

periods without changing position.  (Tr. 301).  On September 25, 2003, claimant was evaluated by physical therapy but was discharged from treatment on November 13, 2003.  (Tr. 302).  Upon discharge, claimant had not attempted his home exercise program, though his trunk range of motion was grossly within normal limits and his strength was normal.  (Tr. 303).  A discharge plan was not made due to claimant's failure to make or keep scheduled appointments.  (Tr. 303).

At an appointment with Dr. Thompson on October 15, 2003, claimant relayed that the Trazodone was not helping him sleep and he continued to experience back pain, which worsened with activity.  (Tr. 305).  He reported that physical therapy was not helpful, though he admitted that he had not started his home exercise program.  Claimant further conceded that he was not taking the Trazodone consistently and that he was going to bed at various times.  Mental status exam was normal without signs of depression, anxiety or agitation.  (Tr.  305).  Claimant's next visit to Avis Goodwin Community Health Center occurred on April 22, 2004, when he complained to Dr. Deborah Harrigan of a rash.  (Tr. 306).  When asked to compose a letter stating that he is disabled, Dr. Harrigan advised the claimant that she did not

think he was disabled and would be unable to write a letter for
him at that time.  (Tr. 306-307).

State Agency physician Dr. Graf conducted a second
evaluation of the claimant on January 8, 2004.  (Tr. 232-234).
Claimant reported experiencing low back, hip, mid back and neck
pain as a result of a series of work-related injuries since 1988.
(Tr. 232).  He stated that he injured both knees in a work-
related accident in 1996.  Dr. Graf diagnosed chronic spinal
pain, probable cervical and thoracolumbar degenerative disc
changes and facet joint changes with chronic pain; history of
work-related injuries with residual pain; chronic anxiety;
abnormal cholesterol and lipid levels with high cardiac risk;
elevated blood sugars; and, educational restrictions.  (Tr. 234).
Dr. Graf opined that claimant is limited in lifting, carrying and
bending.  Dr. Graf added that claimant is restricted
educationally and it "appear[s] that he has a psychiatric
diagnosis of chronic anxiety."  (Tr. 234).

The record contains a medical source statement from Dr.
Paris Khavari dated December 8, 2004.  (Tr. 315-317).  Noting
that her statements were based on claimant's last visit in
November 2003, Dr. Khavari suggested that claimant is limited to

10

lifting and/or carrying twenty-five pounds occasionally and ten pounds frequently and standing and/or walking for at least two hours in an eight-hour workday. (Tr. 315). Claimant's ability to sit is not limited, but Dr. Khavari indicated that claimant cannot perform any heavy pushing or pulling. (Tr. 316). Claimant can frequently balance and occasionally climb and stoop, but never kneel, crouch or crawl. Dr. Khavari did not impose any manipulative, visual or communicative restrictions. (Tr. 317).

On March 4, 1999, Dr. Carol R. Honeychurch, a State Agency physician, rendered a residual functional capacity assessment of the claimant for the current period and for the period from his alleged onset date, June 1, 1997, to his date last insured, December 31, 1997. (Tr. 205-214). Dr. Honeychurch explained that the medical evidence revealed that the claimant has mild low back strain with minimal findings on physical examination. (Tr. 213-214). X-rays reveal no degenerative changes and there had been no surgery. (Tr. 214). Dr. Honeychurch also noted claimant's complaints of right hip and left knee pain, but she relayed that the related examinations and x-rays were unremarkable. She added that claimant's complaints of pain were credible, though the perception of total disability was not

supported by the medical evidence.  Dr. Honeychurch opined that
claimant could lift and/or carry fifty pounds occasionally and
twenty-five pounds frequently, stand and/or walk for about six
hours in an eight-hour workday with normal breaks, sit for about
six hours in an eight-hour workday and push and/or pull with the
upper and lower extremities without restriction.  (Tr. 206).  She
assessed no postural, manipulative, visual, communicative or
environmental limitations.  (Tr. 207-209).

A second physical residual functional capacity assessment of
the claimant for the current period and for the period from
September 15, 1997, to his date last insured, December 31, 1997,
was completed by Dr. Hugh Fairley, a State Agency physician on
February 5, 2004.  (Tr. 242-249).  Like Dr. Honeychurch, Dr.
Fairley opined that claimant could lift and/or carry fifty pounds
occasionally and twenty-five pounds frequently, stand and/or walk
for about six hours in an eight-hour workday with normal breaks,
sit for about six hours in an eight-hour workday and push and/or
pull with the upper and lower extremities without restriction.
(Tr. 243).  As a result of claimant's chronic back strain, Dr.
Fairley limited claimant to occasional climbing, balancing,
stooping, kneeling, crouching and crawling, but he did not impose

any manipulative, visual, communicative or environmental restrictions.  (Tr. 244-246, 249).  Dr. Fairley indicated that claimant's complaints of severe pain were out of proportion to the medical findings.  (Tr. 249).

    2.  <u>Mental Impairments</u>

    On May 19, 1998, claimant was examined by Eric R. Niler, Ph.D., at Salmon Falls Behavioral Health, P.C. (Tr. 179). Claimant stated that his sister, with whom he was living since he was released from prison in March 1998, referred him for an assessment and treatment of his stress and paranoia.  Claimant stated that he was having problems resulting from his homelessness secondary to his ex-fiancée's restraining order against him.  He relayed that he had become socially fearful and isolated and that he lived in fear of violating his probation. Dr. Niler noted that claimant had a long history of alcohol abuse, which both claimant and his sister downplayed given his sobriety since October 1997.  (Tr. 179).  Dr.  Niler provided the provisional diagnoses of schizophrenia, paranoid type, and alcohol abuse and referred claimant to Dr. Joyce Blood for a medication consultation.  Dr. Niler opined that claimant was not capable of gainful employment because of his possible psychosis

in combination with his alcohol abuse.  (Tr.  180).

On referral from Dr. Niler, claimant met with Joyce Blood, Ph.D., on June 6, 1998.  (Tr. 181-182).  On examination, Dr. Blood noted that claimant had a depressed mood and his memory was vague.  (Tr. 182).  There was no evidence of delusions, hallucinations or suicidal ideation.  Dr. Blood diagnosed claimant with depression, substance abuse disorder and intermittent expressive disorder.  She suggested that claimant refrain from using alcohol and that he become involved in an alcohol treatment program.  (Tr. 182).

Dr. Niler conducted a second evaluation of the claimant on February 16, 1999.  (Tr. 277-279).  Dr. Niler indicated that he had seen the claimant once before in May 1998 for possible psychosis due to alcohol dependence, but that claimant now claimed to be sober for over nine months and denied any psychotic symptoms over the past year.  (Tr. 277).  Claimant denied having any mental disability, stating that his disability was due solely to a back injury from 1988.  Dr. Niler suggested that claimant would benefit from a medical evaluation of his back pain and he highlighted that claimant was "neither claiming nor displaying significant psychological symptoms."  (Tr. 279).  He recommended

that claimant be referred to vocational rehabilitation if it was determined that he has a medical disability due to back pain. Dr. Niler noted that claimant seemed motivated for pain management treatment and that he was not in need of psychological treatment at that time.  Dr. Niler added that one year ago, claimant appeared psychotic with decompensation, but there was no evidence of any psychotic disorder currently.  He expected that claimant would maintain a fairly high level of functioning if he learned how to manage his pain.  Dr. Niler opined that claimant could perform light duty work, but a medical evaluation would be needed.  (Tr. 279).

Claimant underwent a consultative psychological examination by Thomas F. Burns, Ph.D., on February 2, 1999.  (Tr. 190–195). Claimant stated that he was not working because he suffered a back injury and that he worries about the domestic problems he has with his girlfriend.  (Tr. 191).  Claimant informed Dr. Burns that he had been convicted of driving while intoxicated in 1988 and 1995 and spent two weeks in a rehabilitation facility in 1995, but he "was never addicted to alcohol" and had not consumed alcohol for one year.  He stated that he attended Alcoholics Anonymous meetings while in prison and while staying at a

homeless shelter, but he was not active in this self-help program or any other type of therapy.  In response to Dr. Burns' questions, claimant denied any history of hallucinations, delusions or symptoms suggestive of a mood disorder.  He stated that he was not taking any medications and that he had taken pain medication in the past, only.  (Tr. 191).

Dr. Burns administered the WAIS-III and the MMPI-II profile. (Tr. 192-193).  The WAIS-III scores, which indicated a full scale IQ of 76, indicated borderline intellectual functioning with no relative strengths or weaknesses.  (Tr. 193). Dr. Burns noted, however, that the MMPI-II profile was difficult to interpret because claimant seemed to struggle with full comprehension of the item meanings and tended to obsess over the responses.  Dr. Burns interpreted the results as indicative of claimant attempting to present himself in a socially desirable light, perhaps as a counter to the charges brought by his exfiancée. Dr. Burns noted that the main import of the MMPI-II profile was as further evidence that claimant is a limited, concrete man whose thoughts are dominated by worries and grievances concerning his problematic family life.  (Tr. 193).  Dr. Burns diagnosed claimant with alcohol abuse, perhaps in remission; borderline

intellectual functioning; and, self-reported back pain.  (Tr.
193).  He stated that he was unable to find substantial evidence
to support a diagnosis of a thought or mood disorder.  (Tr. 194).

On March 5, 1999, Michael A. Schneider, Psy.D., a State
Agency physician, rendered a mental residual functional capacity
assessment of the claimant, which reflected claimant's current
abilities and the abilities he possessed as of December 31, 1997,
his date last insured.  (Tr. 199-204).  Dr. Schneider noted
claimant's May 1998 diagnosis of schizophrenia, paranoid type,
and stated that the source of the schizophrenia diagnosis was not
clear from the examination.  (Tr. 203).  He acknowledged that
some paranoia was mentioned, but he stated that the mental status
examination and the history were not consistent with a diagnosis
of paranoid schizophrenia.  Dr. Schneider concluded that claimant
had the severe impairments of borderline intellectual functioning
and alcohol abuse, in early remission.  (Tr. 204).  Despite these
impairments, however, Dr. Schneider opined that claimant has the
ability to understand, remember and carry out short, simple,
concrete directions for reasonably extended periods of time
without one-to-one supervision.  Claimant can perform these
activities within a schedule and he is capable of persisting to

pace for two-hour periods over the course of a normal workday and
workweek.  Dr. Schneider added that claimant is able to interact
appropriately with peers and supervisors as long as he is in a
somewhat socially isolated work station where there is minimal
need to interact.  Dr. Schneider suggested that it would be
beneficial for claimant to have non-confrontative supervision and
that he can accommodate to routine changes in the work setting,
though he might have some difficulty independently setting more
complex goals because of his limited intellectual functioning.
(Tr. 204).

On February 6, 2004, Dr. Schneider completed a mental
residual functional capacity assessment of the claimant for the
current period and for the period from his alleged onset date to
his date last insured.  (Tr. 250-254).  Based on a review of the
medical evidence of record, Dr. Schneider stated that claimant
retained the ability to understand, remember and carry out short
and simple concrete instructions for extended periods without
special supervision and without an unreasonably high number of
disruptions to pace over the course of a normal workday and
workweek.  (Tr. 252).  Dr. Schneider opined that claimant would
need an environment where he does not have to interact on a

regular basis with the general public, his supervision is not confrontative and there is not a high premium on cleanliness or neatness.  Dr. Schneider added that claimant could interact appropriately with peers and supervisors and accommodate to changes in a work setting.  (Tr. 252).

Claimant was referred for a consultative psychological evaluation for affective disorder, anxiety-related disorders and learning problems, which occurred on January 17, 2004, and was performed by Thomas Lynch, Ph.D.  (Tr. 235-241).  By way of background, claimant informed that he was currently living with his sister, where he had resided since his release from prison in September 2002.  (Tr. 235).  He stated that he had been in prison as a result of violating a restraining order on his ex-fiancée and, also, that he was incarcerated for three years as a result of a high-speed chase with a stolen car.  (Tr. 236).  The court referred the claimant for drug and alcohol rehabilitation and the claimant attended Alcoholics Anonymous and Narcotics Anonymous meetings, but he stopped this treatment when he was released from prison.  (Tr. 236).  Claimant did not view his drinking as a problem and minimized it, though he admitted to three arrests for driving while intoxicated.  (Tr. 237).  He stated that he

currently drank in a limited capacity, only.  (Tr. 237).
When asked to describe his problems, claimant stated that he had
chronic back pain problems since being injured at work in 1989,
which had worsened to the point where it affects his sleep.  (Tr.
235).  He re-injured his back at work in 1996, but his workmen's
compensation claim was denied.  (Tr. 235-236).  Claimant stated
that he had difficulty finding work because of his pain.  (Tr.
236).  He reported that he sleeps all day, awakening at 5:00 pm,
and, thus, has trouble looking for work.  He relayed that he had
not sought treatment from physicians until he was evaluated by
Social Security.  (Tr. 236).

    With regard to his daily activities, claimant indicated that
he has trouble sleeping and, as a result, he does not go to bed
until 3:00 am or 4:00 am, sleeping until 4:00 pm or 5:00 pm.
(Tr. 239).  When he awakens, he has coffee and cigarettes, takes
a shower and listens to music.  He spends time watching
television or playing his guitar.  Claimant relayed that he does
his own laundry, he does some housecleaning chores for his sister
and he cooks simple meals.  He indicated that he believed he
could not work because he feels tired and fatigued all of the
time.  (Tr. 239).

On mental status examination, Dr. Lynch remarked that
claimant's long-term memory for information was somewhat vague
and unclear and his short-term memory showed mild problems, but
his common sense reasoning and judgment were within normal
limits.  (Tr. 238).  Dr. Lynch opined that claimant is able to
perform simple, repetitive tasks.  (Tr. 239).  He suggested that
claimant would work best in an environment where he could work
independently given his lack of social skills.  Although
claimant's attention span was within normal limits, Dr. Lynch
noted that claimant demonstrated mild difficulties with
concentration and short-term memory, problems which may be due to
mild chronic depression or his inconsistent sleeping patterns.
Dr. Lynch indicated that claimant showed little motivation to
complete tasks, which he suggested would be claimant's greatest
impediment.  (Tr. 240).  Dr. Lynch relayed that claimant blamed
his inability to maintain employment on his fatigue, but he noted
that claimant sleeps all day and stays awake all night.
Dr. Lynch reiterated claimant's claim that his arrest and
incarceration for a high-speed chase stemmed from an anxiety
attack, but Dr. Lynch remarked that there was no clear evidence
to support this claim.  He also opined that claimant has a more

21

serious problem with alcohol than he admits to and that he never developed effective coping skills.  Dr. Lynch diagnosed pain disorder, chronic, associated with psychological factors and a general medical condition; alcohol abuse, in partial remission; dysthymia;[1] dependent personality disorder; reported history of arthritis; and, reported history of back strain and high cholesterol.  (Tr. 240).

The record reveals that claimant was brought to the emergency room at Concord Hospital on March 4, 2005, by his two sisters because they were concerned about claimant's depressed mood and suicidal statements.  (Tr. 344).  Claimant reported feeling down, lethargic and having difficulty sleeping.  He stated that his appetite was poor, he felt nervous, he did not want to be around other people and he was having trouble concentrating and remembering things.  Claimant denied experiencing any manic symptoms, but his sister informed the attending physician, Dr. Megan W. Carman, that claimant goes

---

[1]

Dysthymia is defined as "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness.  Stedman's Med. Dictionary, [556] (27th ed. 2000).

22

through periods of depression then cycles into periods where he is very energetic, agitated, impulsive and argumentative. Claimant's sister stated that his last manic episode ended about two months prior and that he had been depressed ever since.  She added that claimant had not been in any ongoing treatment due to lack of follow through and lack of insurance.  Claimant informed that he did not currently have a primary care physician, but he stated that he continued to experience back pain that involves his lower back and neck.  (Tr. 345).

Mental status examination revealed a dull and constricted affect and a dysphoric mood.  (Tr. 346).  Claimant's thought process was slow and logical, but concrete in nature.  Claimant described having passive suicidal thoughts without a present plan.  He denied any history of delusions, hallucinations or paranoia, but his sister reported a history of these symptoms. Although formal cognitive testing was not performed, Dr. Carman stated that claimant appeared to be of low to average intelligence.  Claimant's admitting diagnoses were bipolar disorder, currently depressed, history of alcohol abuse, a probable learning disorder and a history of back injury and head trauma.  Claimant was started on a mood stabilizer, an anti-

depressant and a sedative.  (Tr. 346).

Claimant participated in individual and group psychotherapy during his hospitalization.  (Tr. 328).  No management issues were noted during his stay and although he continued to note depression, Claimant's symptoms steadily improved.  He denied suicidal ideation.  No side effects to his medications were reported and he agreed to take his medicines and follow through with his treatment plan.  Claimant was discharged from Concord Hospital on March 11, 2005, with the diagnoses of bipolar disorder, currently depressed, severe, without psychotic features; history of alcohol abuse; and, a learning disorder, probable.  (Tr. 328-329).  Claimant was provided with indigent prescriptions and follow-up appointments were scheduled for the claimant at Community Partners in Rochester.  (Tr. 328).[2]

### Standard of Review

I.   ALJ Findings Supported by Substantial
     Evidence are Entitled to Deference

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a

---

[2]   Claimant's admission to Concord Hospital occurred after the ALJ's decision of February 14, 2005.

judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing." Factual findings of the Commissioner are
conclusive if supported by substantial evidence.[3] See 42 U.S.C.
§§ 405(g), 1383(c)(3); Irlanda Ortiz v. Secretary of Health &
Human Services, 955 F.2d 765, 769 (1st Cir. 1991). Moreover,
provided the ALJ's findings are supported by substantial
evidence, the court must sustain those findings even when there
may also be substantial evidence supporting the adverse position.
See Tsarelka v. Secretary of Health & Human Services, 842 F.2d
529, 535 (1st Cir. 1988) ("[W]e must uphold the [Commissioner's]
conclusion, even if the record arguably could justify a different
conclusion, so long as it is supported by substantial
evidence."). See also Rodriguez v. Secretary of Health & Human
Services, 647 F.2d 218, 222–23 (1st Cir. 1981).

   In making factual findings, the Commissioner must weigh and
resolve conflicts in the evidence. See Burgos Lopez v. Secretary

---

[3]   Substantial evidence is "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229
(1938). It is something less than the weight of the evidence,
and the possibility of drawing two inconsistent conclusions from
the evidence does not prevent an administrative agency's finding
from being supported by substantial evidence. Consolo v. Federal
Maritime Com., 383 U.S. 607, 620 (1966).

of Health & Human Services, 747 F.2d 37, 40 (1st Cir. 1984)

(citing Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982)).   It

is "the responsibility of the [Commissioner] to determine issues

of credibility and to draw inferences from the record evidence.

Indeed, the resolution of conflicts in the evidence is for the

[Commissioner], not the courts."  Irlanda Ortiz, 955 F.2d at 769

(citation omitted).  Accordingly, the court will give deference

to the ALJ's credibility determinations, particularly where those

determinations are supported by specific findings.  See

Frustaglia v. Secretary of Health & Human Services, 829 F.2d 192,

195 (1st Cir. 1987) (citing Da Rosa v. Secretary of Health &

Human Services, 803 F.2d 24, 26 (1st Cir. 1986)).

II.   The Parties' Respective Burdens

      An individual seeking Social Security benefits is disabled

under the Act if he or she is unable "to engage in any

substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected

to result in death or has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).  See also 42 U.S.C. § 1382c(a)(3).  The Act

places a heavy initial burden on the claimant to establish the

existence of a disabling impairment.  See Bowen v. Yuckert, 482
U.S. 137, 146-47 (1987); Santiago v. Secretary of Health & Human
Services, 944 F.2d 1, 5 (1st Cir. 1991).  To satisfy that burden,
the claimant must prove that his impairment prevents him from
performing his former type of work.  See Gray v. Heckler, 760
F.2d 369, 371 (1st Cir. 1985) (citing Goodermote v. Secretary of
Health & Human Services, 690 F.2d 5, 7 (1st Cir. 1982)).
Nevertheless, the claimant is not required to establish a doubt-
free claim.  The initial burden is satisfied by the usual civil
standard: a "preponderance of the evidence."  See Paone v.
Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982).

Provided the claimant has shown an inability to perform his
previous work, the burden shifts to the Commissioner to show that
there are other jobs in the national economy that he can perform.
See Vazquez v. Secretary of Health & Human Services, 683 F.2d 1,
2 (1st Cir. 1982).  If the Commissioner shows the existence of
other jobs that the claimant can perform, then the overall burden
to demonstrate disability remains with the claimant.  See
Hernandez v. Weinberger, 493 F.2d 1120, 1123 (1st Cir. 1974);
Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

In assessing a disability claim, the Commissioner considers

both objective and subjective factors, including: (1) objective medical facts; (2) the claimant's subjective claims of pain and disability, as supported by the testimony of the claimant or other witnesses; and (3) the claimant's educational background, age, and work experience.  See, e.g., Avery v. Secretary of Health & Human Services, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote, 690 F.2d at 6.  When determining whether a claimant is disabled, the ALJ is also required to make the following five inquiries:

> (1)   whether the claimant is engaged in substantial gainful activity;
>
> (2)   whether the claimant has a severe impairment;
>
> (3)   whether the impairment meets or equals a listed impairment;
>
> (4)   whether the impairment prevents the claimant from performing past relevant work; and
>
> (5)   whether the impairment prevents the claimant from doing any other work.

20 C.F.R. § 404.1520.  See also 20 C.F.R. § 416.920.  Ultimately, a claimant is disabled only if his:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work

28

> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  See also 42 U.S.C. § 1382c(a)(3)(B).

With those principles in mind, this Court reviews claimant's

motion to reverse and the Commissioner's motion to affirm her

decision.

### Discussion

I.  ALJ Decision

In concluding that Mr. Frost was not disabled within the

meaning of the Act, the ALJ properly employed the mandatory five-

step sequential evaluation process described in 20 C.F.R.

§§ 404.1520 and 416.920.  At the first step, he determined that

claimant had not been engaged in substantial gainful employment

since his alleged disability onset date of June 1, 1997, and at

the second step he determined that claimant suffered from severe

impairments including a back disorder, obesity, borderline

intellectual functioning and depression.  (Tr. 15–16, 23 at

Findings 2, 3).  At the third step, the ALJ determined that

claimant's impairment did not meet or medically equal one of the

impairments listed in Part 404, Subpart P, Appendix 1 of the

regulations.  (Tr. 18, 23 at Finding 4).  Consequently, he could

not rely solely upon medical evidence to determine claimant's eligibility for disability benefits but, rather, had to consider claimant's residual functional capacity ("RFC") as it related to his past relevant work as well as other work which existed in the national economy in significant numbers.[4]  (Tr. 19-22).

The ALJ concluded that claimant retained the RFC to perform the exertional demands of medium exertional work.  He noted that "despite the claimant's impairments, he had the residual functional capacity to lift 50 pounds occasionally and 25-pounds frequently, and to sit, stand, and walk for 6-hours out of an 8 hour workday and could perform postural activities occasionally. (Tr. 19, 23 at Finding 7).  He further noted that "claimant has moderate limitations in maintaining social functioning and concentration, persistence or pace but can perform routine and

---

[2]      "RFC is what an individual can still do despite his or her functional limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."  Social Security Ruling, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184 at *2 (July 2, 1996) (citation omitted).

repetitive tasks with occasional social interaction."  (Tr. 20, 23 at Finding 7).  In light of those findings, the ALJ concluded, at step four, that claimant's impairments did not prevent him from performing his past relevant work as a building maintenance man and that he was not "disabled," as that term is defined in the Act, through the date of his decision. (Tr. 21-22, 23 at Finding 8).

## II.   Opinions of Claimant's Treating Source

In challenging the ALJ's disability determination, claimant first asserts that the ALJ failed to ascribe proper weight to the opinions of his treating physician, Dr. Paris Khavari.  He refers to a Residual Functional Capacity Questionnaire completed by Dr. Khavari on December 8, 2004, indicating that claimant could occasionally lift 25 pounds, frequently lift 10 pounds, stand and/or walk for at least 2 hours in an eight hour work day and sit without limitation.  (Tr. 315-16).  Dr. Khavari stated that claimant could not perform any heavy pushing and/or pulling and that he could never kneel, crouch or crawl and may only occasionally climb and stoop.  (Tr. 316).  The RFC assessment was based on claimant's last visit with Dr. Khavari on November 3, 2004. (Tr. 315).

Claimant contends that the ALJ erred (1) by giving only limited weight to Dr. Khavari's opinions and (2) by concluding that Dr. Khavari's opinions were not supported by the record after claimant testified that he had been evaluated by Dr. Khavari on only two occasions.  (Pl's. Mem. 3-4).  Claimant states that he was evaluated by Dr. Khavari on three occasions and that he provided Dr. Khavari with copies of "multiple records and exams." (Pl's. Mem. 4).  He further states that because of his long-standing history of back pain, his reports of severe back pain "to local Emergency Rooms and his primary care physicians on numerous occasions" and an x-ray that revealed degenerative changes in his lumbar spine and disc space narrowing at T12-L1, the AlJ should have given controlling weight to Dr. Khavari's opinions.  (Pl's. Mem. 4).

The opinions of a treating physician are entitled to controlling weight as long as they are well supported by medically acceptable diagnostic techniques and are not inconsistent with the medical record.  See 20 C.F.R. § 404.1527(d)(2).  An ALJ is required to give reasons in the disability determination for the weight ascribed to the treating source's opinion.  Id.; SSR 96-2p, 1996 WL 374188, *5.

32

Determining a claimant's RFC, however, is an administrative
decision that is the responsibility of the Commissioner.  See 20
C.F.R. § 404.1527(e)(2).  For that reason, a treating physician's
opinion as to the claimant's RFC, whether his impairments meet or
equal a listed impairment, and whether he is disabled is not
controlling on the ALJ in making that determination.  SSR 96-5p,
1996 WL 374183, *3 (July 2, 1996).  See also Diaz v. Chater, 55
F.3d 300, 306 n.2 (7th Cir. 1995); West v. Barnhart, 254 F. Supp.
2d 1216, 1221 (D. Kan. 2003); Ileri v. Barnhart, No. Civ. 03-107-
JD, 2003 WL 22843077, *4, (D.N.H. Dec. 1, 2003); Poland v.
Halter, 2001 WL 920038, *6 (D.N.H. Aug. 2, 1001).  As provided in
20 C.F.R. § 404.1527(e)(2):

> Opinions on some issues, such as the examples that
> follow, are not medical opinions, as described in
> paragraph (a)(2) of this section, but are, instead,
> opinions on issues reserved to the Commissioner because
> they are administrative findings that are dispositive
> of a case; i.e., that would direct the determination or
> decision of disability.
>
> (2)   Other opinions on issues reserved to the Commissioner.
> We use medical sources, including your treating source, to
> provide evidence, including opinions, on the nature and
> severity of your impairment(s).  Although we consider
> medical opinions from medical sources on issues such as
> whether your impairment(s) meets or equals the requirements
> of any impairment(s) in the Listing of Impairments in
> appendix 1 to this subpart, your residual functional
> capacity (see §§ 404.1545 and 404.1546), or the application
> of vocational factors, the final responsibility for deciding

33

these issues is reserved to the Comissioner.
20 C.F.R. § 404.1527(e)(2).

In this case, the ALJ reviewed the medical evidence of
claimant's impairments.  The ALJ explained that he was giving
only limited weight to the opinions of Dr. Khavari because Dr.
Khavari "was not the claimant's treating physician, but rather,
only examined him once in November 2003."  The ALJ noted that
while Dr. Khavari completed two RFC assessments of the claimant,
both were based on one visit in November 2003.  The ALJ added
that "the assessment from Dr. Khavari, in contrast to the state
agency assessments, does not discuss or cite supportive
clinical/objective findings and does not, in any event, provide
support for Mr. Frost's allegations of a complete inability to
work but rather contains limitations consistent with the
performance of work at a sedentary level."  (Tr. 19).  The AlJ
further explained that he was not giving controlling weight to
Dr. Khavari's opinions as to the severity of claimant's
impairments because those opinions were contradicted by the
opinions of Dr. Harrigan, claimant's treating physician.  (Tr.
19-20).  As noted by the ALJ, Dr. Harrigan "declined to certify
disability and stated the claimant did not plan to return to Dr.

Khavari." (Tr. 20). Therefore, the ALJ appropriately decided to give only limited weight to Dr. Khavari's opinions with regard to claimant's residual functional capacity. Even assuming that Dr. Khavari was a treating source, his opinions are not a medical opinions but rather are opinions as to claimant's residual functional capacity, which is an issue expressly reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(1)–(3), 404.1546, 416.927(e)(1)–(3), 416.946; SSR 96–5p.

The ALJ's decision to give only limited weight to the opinions of Dr. Khavari is supported by substantial evidence in the record. As the ALJ properly reasoned, Dr. Khavari's opinions were unsupported by clinical and objective findings and were contradicted by the opinions of claimant's treating physicians. Accordingly, this Court concludes that the ALJ did not err in giving only limited weight to Dr. Khavari's opinions. Based on a careful review of the entire record, this Court is compelled to conclude that there is substantial evidence to support the ALJ's determination that, while claimant's impairments are undeniably severe, they do not render him completely disabled, as that term is defined in the Act.

III. <u>The ALJ's Credibility Determination</u>

Claimant next alleges that the ALJ committed reversible error by concluding that his testimony was not totally credible and by failing to take into consideration his inability to obtain medical care.  (Compl. ¶ 8).

When determining a claimant's RFC, the ALJ must review the medical evidence regarding the claimant's physical limitations as well as the claimant's own description of those physical limitations, including his subjective complaints of pain.  <u>See Manso-Pizarro v. Secretary of Health & Human Services</u>, 76 F.3d 15, 17 (1st Cir. 1996).  "When, as here, the claimant has demonstrated that he suffers from an impairment that could reasonably be expected to produce the pain or symptoms he alleges, the ALJ must then evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent, if any, to which they limit his ability to do basic work activities."  <u>Smith v. Barnhart</u>, No. Civ. 02-081-M, 2003 WL 1191401, *4 (D.N.H. March 12, 2003).

> [W]henever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case

record.  This includes medical signs and laboratory
findings, the individual's own statements about the
symptoms, any statements and other information provided
by the treating or examining physicians or
psychologists and other persons about the symptoms and
how they affect the individual . . .

In recognition of the fact that an individual's
symptoms can sometimes suggest a greater level of
severity of impairment than can be shown by the
objective medical evidence alone, 20 C.F.R. 404.1529(c)
and 416.929(c) describe the kinds of evidence,
including the factors below, that the adjudicator must
consider in addition to the objective medical evidence
when assessing the credibility of an individuals'
statements.

Social Security Ruling, <u>Policy Interpretation Ruling Titles II</u>

<u>and XVI: Evaluation of Symptoms in Disability Claims: Assessing</u>

<u>the Credibility of an Individual's Statements</u>, SSR 96-7p, 1996 WL

374186 (July 2, 1996).  Factors to be considered include the

claimant's daily activities; the location, duration, frequency,

and intensity of the claimant's pain or other symptoms; factors

that precipitate and aggravate the symptoms; the type dosage,

effectiveness, and side effects of any medication the claimant

takes (or has taken) to alleviate pain or other symptoms; and any

measures other than medication that the claimant receives (or has

received) for relief of pain or other symptoms.  <u>Ramsey v.</u>

<u>Barnhart</u>, No. Civ. 02-081-M, 2007 WL 496709 slip op. at *6

(D.N.H. Feb. 13, 2007).  <u>See also</u> <u>Avery</u>, 797 F.2d at 23; 20

C.F.R. § 404.1529(c)(3).

It is, however, the ALJ's role to assess the credibility of claimant's asserted inability to work in light of the medical record, to weigh the findings and opinions of both treating sources and other professionals who have examined him and/or reviewed his medical records, and to consider the other relevant factors identified by the regulations and applicable case law. Part of that credibility determination necessarily involves an assessment of a claimant's demeanor, appearance, and general "believability."  Accordingly, if properly supported, the ALJ's credibility determination is entitled to substantial deference from this Court.  See, e.g., Irlanda Ortiz, 955 F.2d at 769 (holding that it is "the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner] not the courts").

Here, claimant asserts that the ALJ erred by concluding that his testimony was not totally credible and by failing to take into consideration his inability to obtain medical care.  (Compl. ¶ 8).  The ALJ found that "the objective medical evidence of record simply fails to establish an underlying medical basis

which would reasonably lead one to believe that the claimant is experiencing such severe pain that he is incapable of working." (Tr. 20). The ALJ then assessed claimant's credibility and concluded that "[g]iven the claimant's activities, his history of treatment and noncompliance with treatment, as well as the physician reports of record, I am unable to find his complaints of a complete inability to work fully credible." (Tr. 21).

With regard to claimant's daily activities, the ALJ noted that claimant conceded that "he prepares his own meals, does all his own shopping, laundry and light cleaning and maintenance around the house and is not dependent on anybody else for his care." (Tr. 20). In discounting claimant's statements regarding his inability to work and his inability to obtain medical care, the ALJ reasoned:

> The record also includes evidence that the claimant could reduce his back pain through physical therapy, but on all occasions the record shows he failed to comply with this advice or with such treatment (Exhibit 23F, pp. 5, 7, 8). The claimant was discharged from physical therapy due to failure to make or keep scheduled appointments. Both physical therapy notes and his doctor's notes indicate he had not even attempted the recommended home exercise program (Exhibits 23F5, 23F7). This failure to comply with such a fundamental, non-demanding treatment recommendation raises a question about the credibility of the claimant's complaints. . .

>       Although his treatment has been limited due to a lack
>       of insurance, he has not always been compliant with
>       treatment when it was available.

(Tr. 21).  In discounting the claimant's subjective testimony,

the ALJ reasoned:

>       There is further evidence that the claimant has
>       exaggerated the degree of his pain in order to get
>       disability.  Dr. David Flavin noted on May 4, 2004 in a
>       letter to Dr. Deborah Harrigan that the claimant
>       complained of intense pain but had minimal findings.
>       Dr. Flavin noted that the claimant asked for a note
>       saying that he could not work so he could get on
>       disability.  The request was denied (Exhibit 23F,
>       p.11).  In medical records dated April 22, 2004, Dr.
>       Harrigan noted the claimant asked her to write that he
>       could not work.  She recorded her answer as, "I advised
>       him that I would not say that he is not able to work."
>       (Exhibit 23F, p.8).  She also declined to write a note
>       to city welfare stating he was disabled.  (Exhibit
>       23F9).  In light of these inconsistencies, I find the
>       claimant's subjective testimony to be less than
>       credible.

In light of the foregoing, this Court cannot conclude that

the ALJ erred in making his assessment of claimant's credibility.

There is substantial evidence in the record to support the ALJ's

conclusion that claimant's impairments do not render him totally

disabled.  Further, there is substantial evidence in the record

to demonstrate that the ALJ considered claimant's inability to

obtain medical care.

IV.  <u>Claimant's Depression</u>

Lastly, claimant alleges that the ALJ committed reversible error in failing to consider his "restrictions due to his depression and inability to maintain a schedule."  (Compl. ¶ 8).

First, the ALJ determined that claimant's depression did not meet or medically equal one of the impairments listed in Part 404, Subpart P, Appendix 1 of the regulations.  (Tr. 18, 23 at Finding 4).  In reaching this conclusion, the ALJ relied on the medical records of Drs. Niler and Lynch.  Dr. Niler conducted a psychosocial evaluation of the claimant on May 19, 1998 and found that claimant was not capable of gainful employment because of his possible psychosis in combination with his alcohol abuse. (Tr. 17, 180).  However, in a second evaluation conducted on February 16, 1999, Dr. Niler found that claimant no longer displayed psychotic symptoms or any evidence of a psychotic disorder.  (Tr. 17, 277–79).  In fact, Dr. Niler noted that claimant denied having any mental disability and stated that he was pursuing disability only for his back impairment.  <u>Id</u>.  Dr. Niler opined that claimant was not in need of psychiatric treatment and was capable of performing light duty work.  (Tr. 17, 279).

41

The ALJ also relied on a consultative psychological evaluation on the claimant performed by Dr. Lynch on January 17, 2004.  (Tr. 17, 235–241).  While claimant continued to have difficulty sleeping due to his physical pain and naps during the day, (Tr. 17, 235), Dr. Lynch found him capable of performing his activities of daily living simple and capable of learning simple, repetitive tasks, (Tr. 17, 239).  Dr. Lynch noted that claimant's concentration was only mildly limited and possibly related to mild chronic depression (Tr. 239) or his sleeping patterns, (Tr. 18, 239).  He also noted that claimant showed little motivation to complete tasks, which he suggested would be claimant's greatest impediment.  (Tr. 18, 240).

Second, the ALJ determined that despite claimant's mental impairments, he can still perform simple, repetitive tasks that only require occasional social interaction.  (Tr. 20).  In reaching this conclusion, the ALJ relied on a Psychiatric Review Technique form completed by Dr. Schneider on February 6, 2004, stating there was insufficient medical evidence to determine whether claimant had a mental impairment from his alleged onset date through the date he was last insured, December 31, 1997.  (Tr. 20, 250–54).  As noted by the ALJ, "Dr. Schneider found the

claimant currently had evidence of an affective disorder, a
somatoform disorder, and a personality disorder, but for the
affective disorder the claimant met none of the criteria under
subsection (A) for depression, and under subsection (B) had only
moderate restrictions in his activities of daily living, social
functioning,, concentration, persistence or pace and he had no
episodes of decompensation."  (Tr. 20, 250-54).

The ALJ also relied on a mental residual functional capacity
assessment rendered by Dr. Schneider on March 5, 1999, finding
"that claimant was only moderately impaired in his ability to
remember and carry out detailed instructions, interact
appropriately with the general public, respond appropriately to
instructions from supervisors and changes in the work setting and
to get along with co-workers."  (Tr. 20, 204 ).  The record
reflects that Dr. Schneider noted claimant's May 1998 diagnosis
of schizophrenia, paranoid type, but stated that the source of
the schizophrenia diagnosis was not clear from the examination.
(Tr. 203).  While he acknowledged that some paranoia was
mentioned, he stated that the mental status examination and the
history were not consistent with a diagnosis of paranoid
schizophrenia.

In light of the foregoing, this Court cannot conclude that the ALJ erred in considering claimant's restrictions caused by his depression and his inability to maintain a schedule.  The ALJ's findings with regard to claimant's depression are adequately supported by the record.

## Conclusion

For the reasons stated above, this Court cannot conclude that the ALJ erred in failing to give controlling weight to the opinions of claimant's treating source.  Nor can this Court conclude that the ALJ erred in assessing claimant's credibility or in considering his inability to obtain medical treatment and his restrictions caused by his depression.  To be sure, claimant suffers from impairments that the ALJ recognized as severe. Importantly, however, there is substantial evidence in the record to support the ALJ's conclusion that, while claimant's impairments are undeniably severe, claimant remains capable of performing work at the medium exertional level.

Having carefully reviewed the administrative record and the arguments advanced by both the Commissioner and claimant, this Court concludes that there is substantial evidence in the record to support the ALJ's determination that claimant was not disabled

at any time prior to and through the date of the ALJ's decision. The ALJ's use of opinions offered by claimant's treating physician, his credibility determination and his consideration of the restrictions caused by claimant's depression and inability to maintain a schedule are well-reasoned and well-supported by substantial documentary evidence.

For the foregoing reasons, I recommend that claimant's motion to reverse the decision of the Commissioner (document no. 10) be denied, and the Commissioner's motion to affirm her decision (document no. 11) be granted.


_____
James R. Muirhead
United States Magistrate Judge

Date: March 21, 2007

cc:   Vicki S. Roundy, Esq.
      David L. Broderick, Esq.